1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10   CHANEL L. JOHNSON,           )      NO. CV 08-03878-CT
                                  )
11                  Plaintiff,    )      OPINION AND ORDER
                                  )
12            v.                  )
                                  )
13   MICHAEL J. ASTRUE,           )
     COMMISSIONER, SOCIAL SECURITY )
14   ADMINISTRATION,              )
                                  )
15                  Defendant.    )
                                  )
16   _____)

17

18        For the reasons set forth below, it is ordered that judgment be

19   entered in favor of defendant Commissioner of Social Security ("the

20   Commissioner") because the Commissioner's decision is supported by

21   substantial evidence and is free from material legal error.

22                        SUMMARY OF PROCEEDINGS

23        On June 17, 2008, plaintiff, Chanel L. Johnson ("plaintiff"),

24   filed a complaint seeking judicial review of the denial of benefits

25   by the Commissioner pursuant to the Social Security Act ("the Act").

26   The parties consented in writing to proceed before the magistrate

27   judge.  On December 4, 2008, plaintiff, represented by counsel, filed

28   a brief in support of the complaint.  On January 7, 2009, the

1 | Commissioner filed an opposition brief.

2 | SUMMARY OF ADMINISTRATIVE RECORD

3 | 1.   Proceedings

4 | On July 26, 2006, plaintiff filed an application for supplemental security income ("SSI"), alleging disability since December 30, 2001, due to: "severe depression, mood swings, schizophrenic (sic), bipolar, insomnia, aggressive behavior, tension, anger, phobia, hostility, nightmares, hallucination and anxiety." (TR 20, 134).[1] The application was denied on November 7, 2006. (TR 16).

Plaintiff filed a request for a hearing, and on December 12, 2007, plaintiff, represented by counsel, testified before an ALJ. (TR 36-56). The ALJ also heard testimony of a medical expert, (TR 2-3), vocational expert, (TR 30-32), and plaintiff's uncle (TR 23-30). On January 11, 2008, the ALJ issued a decision concluding that, while plaintiff had the medically determinable impairments of major depressive disorder and post-traumatic stress disorder ("PTSD"), she did not have a severe impairment or combination of impairments. (TR 18). Accordingly, the ALJ found she was not disabled and thus not entitled to benefits. (TR 24). On April 4, 2008, plaintiff's request to the Social Security Appeals Council to review the ALJ's decision was denied (TR 3). The ALJ's decision thus stands as the final decision of the Commissioner. Plaintiff subsequently sought judicial review in this court.

---

[1]   "TR" refers to the transcript of the record of administrative proceedings in this case and will be followed by the relevant page number(s) of the transcript.

2

2.   Summary Of The Evidence

The ALJ's decision is attached as an exhibit to this opinion and order and, except as otherwise noted, materially summarizes the evidence in the case.

PLAINTIFF'S CONTENTIONS

Plaintiff raises only one issue.  She contends that the ALJ made a legal error in considering the medical evidence – specifically, by not addressing the "complete" findings of the consultative psychiatric medical examiner – and therefore improperly concluded that plaintiff's mental impairment was non-severe.

STANDARD OF REVIEW

Under 42 U.S.C. §405(g), this court reviews the Commissioner's decision to determine if: (1) the Commissioner's findings are supported by substantial evidence; and, (2) the Commissioner used proper legal standards.  Macri v. Chater, 93 F.3d 540, 543 (9th Cir. 1996).  Substantial evidence means "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 401 (1971), but less than a preponderance.  Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997).

When the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, however, the Court may not substitute its judgment for that of the Commissioner.  Flaten v. Secretary of Health and Human Services, 44 F.3d 1453, 1457 (9th Cir. 1995).

DISCUSSION

1.   The Sequential Evaluation

A person is "disabled" for the purpose of receiving social

3

security benefits if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1)(A).

The Commissioner has established a five-step sequential evaluation for determining whether a person is disabled.  First, it is determined whether the person is engaged in "substantial gainful activity."  If so, benefits are denied.

Second, if the person is not so engaged, it is determined whether the person has a medically severe impairment or combination of impairments.  If the person does not have a severe impairment or combination of impairments, benefits are denied.

Third, if the person has a severe impairment, it is determined whether the impairment meets or equals one of a number of "listed impairments." If the impairment meets or equals a "listed impairment," the person is conclusively presumed to be disabled.

Fourth, if the impairment does not meet or equal a "listed impairment," it is determined whether the impairment prevents the person from performing past relevant work.  If the person can perform past relevant work, benefits are denied.

Fifth, if the person cannot perform past relevant work, the burden shifts to the Commissioner to show that the person is able to perform other kinds of work.  The person is entitled to benefits only if the person is unable to perform other work.  20 C.F.R. § 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

4

1        2.   Mental Impairment

2        Plaintiff contends the ALJ erred in finding that her major

3   depressive disorder and PTSD were non-severe at the second step in

4   this evaluation because, plaintiff urges, the ALJ failed to properly

5   consider the "complete" findings of consultative psychiatric medical

6   examiner Dr. Stephen Simonian, who examined plaintiff on September 30,

7   2006.[2]

8        A severe impairment or combination of impairments is one which

9   significantly limits the physical or mental ability to perform basic

10  work activities.   20 C.F.R. § 416.920(c);    see also  20 C.F.R.

11  § 416.921(b)(describing basic work activities).   A plaintiff is not

12  required to establish total disability at this level of the

13  evaluation.   Rather, the severe impairment requirement is a threshold

14  element that plaintiff must prove in order to establish disability

15  within the meaning of the Act.    Bowen v. Yuckert, 482 U.S. at 146.

16  An impairment will be considered non-severe when medical evidence

17  establishes only a "slight abnormality or a combination of slight

18  abnormalities which would have no more than a minimal effect on the

19  individual's ability to work even if the individual's age, education,

20  or work experience were specifically considered."   Social Security

21  Ruling 85-28; Bowen v. Yuckert, 482 U.S. at 154 n.12.

22       Alleged mental impairments are evaluated under the same

23  sequential analysis as physical impairments.   Once the Commissioner

24  determines that a mental impairment exists, the Commissioner must then

25  _____

26       [2] The full summary report of Dr. Simonian's complete
    psychiatric evaluation is at TR 165-68.   The section specifically
27  at issue is at TR 167-68.

28                                5

evaluate the degree of functional loss it causes by rating plaintiff's level of functional limitation in four areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) deterioration or decompensation in work or work-like settings. If an individual's limitations are rated as mild in the first three areas and the individual has had no episodes of deterioration or decompensation, the mental impairment will normally be found to be not severe. 20 C.F.R. § 416.920a.

Here, after considering all the evidence of record, the ALJ found that the evidence was insufficient "to establish the presence of a severe mental impairment." (TR 20). Plaintiff contends that in reaching this decision the ALJ improperly "ignored pertinent parts" of consultative psychiatrist Dr. Simonian's opinion without articulating a legally sufficient basis for doing so.

It is correct, as plaintiff contends, that the ALJ may reject the uncontroverted opinion of a consultative psychiatrist only for clear and convincing reasons. Similarly, an ALJ may not reject even a contradicted opinion of an examining physician without providing "specific and legitimate reasons that are supported by substantial evidence." Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1996).

But the ALJ here did not reject the testimony of Dr. Simonian. To the contrary, the ALJ specifically elected to adopt his conclusion:

> Dr. Simonian opined that [plaintiff] was able to perform all psychiatric work-related activities without limitation (Exhibit 1F)[3]. I concur with this assessment.

-----

[3]TR 165-68.

6

1    (TR 21-22).[4]

2      Plaintiff argues, however, that in the section of his report

3    entitled "Diagnosis (DSM IV)"[5], Dr. Simonian concluded plaintiff's

4    "functional ability" was "reduced" to 65%.[6] (TR 168).  This number

5    means, plaintiff urges, that she has only a 65% level of functioning

6    and cannot, therefore, work a forty-hour week.

7      Plaintiff cites no support for this interpretation.  Rather, this

8    number appears to refer to plaintiff's global assessment of function

9

---

10    [4]Specifically, Dr. Simonian's "Functional Assessment" of plaintiff was as follows:

11    "1.   The [plaintiff] is able to understand, remember, and carry out simple one or two-step job instructions.

12    2.   The [plaintiff] is able to do detailed and complex instructions.

13    3.   The [plaintiff] is able to relate and interact with supervisors, co-workers, and the public.

14    3.   The [plaintiff] is able to maintain concentration and attention on a persistent basis.

15    4.   The [plaintiff] is able to perform day-to-day work activity, including attendance and safety.

16    5.   The [plaintiff] is able to adapt to the stresses common to a normal work environment.

17    6.   The [plaintiff] is able to maintain regular attendance in the work place and perform work activities on a consistent basis.

18

19    7.   The [plaintiff] is able to perform work activities without special or additional supervision."

20    (TR 168)

21    [5]The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") (4th Ed.

22    2000) is the manual that physicians, psychiatrists, psychologists, therapists, and social workers use to diagnose

23    mental illness.

24    [6] The full relevant paragraph stated that plaintiff:  "was

25    properly dressed. Hygiene was good. The [plaintiff] is able to do her activities of daily living.  The [plaintiff] is able to use

26    the bus for transportation.  The [plaintiff] took the bus to the evaluation today.  Functional ability was judged to be 65%." (TR

27    167-68).

28                        7

("GAF") score.[7]   A GAF score of 65 is given when a clinician
determines that an individual has:  "some mild symptoms (e.g.,
depressed mood and mild insomnia) OR some difficulty in social,
occupational, or school functioning (e.g., occasional truancy, or
theft within the household), but [is] generally functioning pretty
well, has some meaningful interpersonal relationships." DSM-IV-TR, p.
34.   Therefore, rather than suggest that plaintiff is severely
disabled, a GAF score of 65 actually bolsters the ALJ's conclusion
that plaintiff's PTSD and major depressive disorder are non-severe.[8]

     Nevertheless, whether or not the reference to 65% refers to a GAF
score, every other conclusion Dr. Simonian drew about the plaintiff
suggests she is capable of substantial gainful activity.  (TR 165-68).
In the section of the report at issue (TR 167-68) and throughout the
report, Dr. Simonian concluded that plaintiff was alert and oriented,
her appearance and behavior appropriate, her thought processes
ordered, her mental skills "intact and average," and he ultimately
concluded that she was able to follow instructions and carry out day-

_____

[7]A GAF score is the fifth level ("axis") of the DSM(IV)
multiaxial classification.  The Axis V, GAF score is used "for
reporting the clinician's judgment of the individual's overall
level of functioning." DSM-IV-TR, p. 32. The GAF scale is divided
into 10 ranges of functioning on an overall scale of 0-100. DSM-
IV-TR, p. 34.  The reference to 65% and about which plaintiff is
concerned is contained in the section of Dr. Simonian's report
entitled "Diagnosis (DSM IV)" and in a sub-section labeled "Axis
V."  (TR 167).

[8]In any event, the Commissioner has determined that the GAF
scale "does not have a direct correlation to the severity
requirements in [the Social Security Administration's] mental
disorders listings."  65 Fed. Reg. 50,746, 50,765 (Aug. 21,
2000).

8

1  to-day work activities. (TR 166-68).

2      Moreover, medical expert David Petersen, Ph.D., testified that
3  the medical evidence as a whole indicated plaintiff was responding
4  well to medication and treatment (TR 44), and that any mental disorder
5  she suffered was mild and would result in only a "minimal impact" on
6  her functioning.  (TR 43-44.)  The reports of state agency physicians
7  who reviewed the medical evidence concluded plaintiff's impairments
8  were, at most, mild and were not severe.  (TR 169-179.)  The notes of
9  plaintiff's treating physician do not contradict or detract from these
10 conclusions.    (TR 187-210.)    Further, the ALJ found that the
11 allegations of plaintiff and her uncle regarding the intensity,
12 persistence, and limiting effect of her symptoms, were not entirely
13 credible based on inconsistencies between their testimony and the
14 record. (TR 20, 23.)  As one example, although plaintiff and her uncle
15 both testified that plaintiff cannot read (TR 22-23, 53, 62), in her
16 disability paperwork petitioner admitted she could read, and
17 furthermore stated that she completed high school and did not attend
18 special education classes (TR 133, 138, 52-53).

19     Thus, the ALJ's finding that plaintiff's alleged mental
20 impairment was non-severe is supported by substantial evidence and
21 free from material legal error.

22                          CONCLUSION

23     If the evidence can reasonably support either affirming or
24 reversing the Commissioner's conclusion, the court may not substitute
25 its judgment for that of the Commissioner.  <u>Flaten v. Secretary of</u>
26 <u>Health and Human Services</u>, 44 F.3d at 1457.

27     After careful consideration of the record as a whole, the

28                              9

magistrate judge concludes that the Commissioner's decision is supported by substantial evidence and is free from material legal error.   Accordingly, it is ordered that judgment be entered in favor of the Commissioner.

DATED: January 12, 2009  _Carolyn Turchin_

CAROLYN TURCHIN
UNITED STATES MAGISTRATE JUDGE

## SOCIAL SECURITY ADMINISTRATION
### Office of Disability Adjudication and Review

### DECISION

<u>IN THE CASE OF</u>

Chanel L Johnson
(Claimant)

_____
(Wage Earner)

<u>CLAIM FOR</u>

Supplemental Security Income

_____
(Social Security Number)

## JURISDICTION AND PROCEDURAL HISTORY

On July 26, 2006, the claimant filed an application for supplemental security income, alleging disability beginning December 30, 2001. The claim was denied initially on November 7, 2006. Thereafter, the claimant filed a timely written request for hearing on January 11, 2007 (20 CFR 416.1429 *et seq.*).

The claimant appeared and testified at a hearing held on December 12, 2007, in Los Angeles, CA. Also appearing and testifying were David B Peterson, an impartial medical expert and Susan D Green, an impartial vocational expert. The claimant is represented by Janice Brenman, an attorney.

## ISSUES

The issue is whether the claimant is disabled under section 1614(a)(3)(A) of the Social Security Act. Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

Although supplemental security income is not payable prior to the month following the month in which the application was filed (20 CFR 416.335), the undersigned has considered the complete medical history consistent with 20 CFR 416.912(d).

After careful consideration of all the evidence, the undersigned Administrative Law Judge concludes the claimant has not been under a disability within the meaning of the Social Security Act since July 26, 2006, the date the application was filed.

See Next Page

 EXHIBIT  16

## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 416.920(a)). The steps are followed in order. If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the undersigned must determine whether the claimant is engaging in substantial gainful activity (20 CFR 416.920(b)). Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 416.972(a)). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 416.972(b)). Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA (20 CFR 416.974 and 416.975). If an individual engages in SGA, she is not disabled regardless of how severe her physical or mental impairments are and regardless of her age, education, and work experience. If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 416.920(c)). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 416.921; Social Security Rulings (SSRs) 85-28, 96-3p, and 96-4p). If the claimant does not have a severe medically determinable impairment or combination of impairments, she is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, the undersigned must determine whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926). If the claimant's impairment or combination of impairments meets or medically equals the criteria of a listing and meets the duration requirement (20 CFR 416.909), the claimant is disabled. If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the undersigned must first determine the claimant's residual functional capacity (20 CFR 416.920(e)). An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 416.920(e) and 416.945; SSR 96-8p).

EXHIBIT 17

Next, the undersigned must determine at step four whether the claimant has the residual functional capacity to perform the requirements of her past relevant work (20 CFR 416.920(f)). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 416.960(b) and 416.965). If the claimant has the residual functional capacity to do her past relevant work, the claimant is not disabled. If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 416.920(g)), the undersigned must determine whether the claimant is able to do any other work considering her residual functional capacity, age, education, and work experience. If the claimant is able to do other work, she is not disabled. If the claimant is not able to do other work and meets the duration requirement, she is disabled. Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 416.912(g) and 416.960(c)).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, the undersigned makes the following findings:

**1.   The claimant has not engaged in substantial gainful activity since July 26, 2006, the application date (20 CFR 416.920(b) and 416.971 et seq.).**

**2.   The claimant has the following medically determinable impairment: major depressive disorder; and PTSD (20 CFR 416.920(c)).**

**3.   The claimant does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant does not have a severe impairment or combination of impairments (20 CFR 416.921).**

Basic work activities are the abilities and aptitudes necessary to do most jobs. Examples of these include:

1. Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

2. Capacities for seeing, hearing, and speaking;

3. Understanding, carrying out, and remembering simple instructions;

See Next Page

**EXHIBIT 18**

Chanel L Johnson ██████████

4. Use of judgment;

5. Responding appropriately to supervision, co-workers, and usual work situations; and

6. Dealing with changes in a routine work setting (SSR 85-28).

In reaching the conclusion that the claimant does not have an impairment or combination of impairments that significantly limits her ability to perform basic work activities, the undersigned considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSRs 96-4p and 96-7p. The undersigned also considered opinion evidence in accordance with the requirements of 20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, the undersigned must follow a two step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

Because a claimant's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 416.929(c) describes the kinds of evidence, including the factors below, that the undersigned must consider in addition to the objective medical evidence when assessing the credibility of the claimant's statements:

1. The claimant's daily activities;

2. The location, duration, frequency, and intensity of the claimant's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms;

See Next Page

EXHIBIT  19

Chanel L Johnson ▮▮▮▮▮▮                                        Page 5 of 9

6. Any measures other than treatment the claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms (SSR 96-7p).

The claimant states that she is unable to work due to "severe depression, mood swings, schizophrenic, bipolar, insomnia, aggressive behavior, tension, anger, phobia, hostility, nightmares, hallucination and anxiety." She states, "because of my medications I feel down and I can not focus and follow the directions. I see and hear things. I have loss of memory. I can not be around other people. I do have nightmares almost every night. I can not sleep well so I take medications. Sometimes I do have headaches and I do have migrains (sic)" (Exhibit 1E/2).

At the hearing, the claimant testified regarding abuse by her mother when she was age 12 with a stick and hot water, not feeding, left home alone. She states that she finished high school. She last used marijuana at age 17 or 18 (but see Exhibit 5F/17 wherein she reported using "occasional THC" as recently as June 2006). She states that she lives with her uncle and has been living there for several years. She receives GR. She takes her medicine and stays in the house. She states that she does no chores around the house. She states that she cannot read and that her uncle reads to her (but see Exhibit 1E/1 wherein the claimant reported that she is able to read). She states she cannot do household chores because she does not have a good memory. She states that medication causes dizziness and sleepiness (but see Exhibit 5F wherein it is noted that the claimant has no side effects from medication. Reported drowsiness was resolved with a medication adjustment—also Exhibit 1E/6). She states that she has crying spells 3 times a week. She lies down during the day 3 times and she is sleeping for 2 to 3 hours. She states that she sleeps most of the day. She also sleeps at night but not as easily. She states she is seeing Dr. Mohr once a month or every 2 months. She states she was in regular classes in school (which would seem to contradict her allegation that she is unable to read).

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

Treatment notes from Los Angeles County Department of Mental Health reveal that the claimant presented on September 20, 2005 and reported to a social worker that she was "depressed, angry, cries easily, hears voices (she thinks sometimes its her deceased mother and grandma), had nightmares (scared to sleep in dark), paranoid of lots of sounds, thing, daily around her (everywhere I go)—the voices call me." She stated that she might feel her mom may be "haunting" her. She also reported being neglected as a child. She was not suicidal or homicidal. She reported that she had been living on trust money left by her mom and now she recently started on GR. Based on this report, the social worker diagnosed major depressive disorder, recurrent, with psychotic features and referred the claimant for further evaluation. However, the claimant did not return until June 16, 2006, 9 months later at which time she stated that she was now ready to participate in the various groups offered. She continued to complain of depression

See Next Page                        EXHIBIT          20

Chanel L Johnson █████████

Page 6 of 9

but she was not suicidal and had not had any psychiatric or other medical treatment. She denied ever taking medication for psychiatric problems. Mental status was essentially normal (Exhibit 5F/20-23). Initial evaluation by Dr. Mohr on June 29, 2006 reveals that the claimant reported that she was living with a long term friend (male). She stated that her mom had abused her and she had been placed in a foster home at age 13. She completed high school. She complained of having intrusive repetitive thoughts of trauma, not sleeping, crying spells, low energy, isolative, feeling worthless. She was not working. Mental status evaluation revealed that the claimant's mood was depressed and anxious with a "brave affect." There was no memory deficit. She was intelligent. She denied having hallucinations or delusions. She denied suicidal or homicidal thoughts. She reported "occasional" use of THC to "decrease the sadness." She was taking no medications. She reported that her health was otherwise normal. Dr. Mohr prescribed Trazodone and Lexapro. By July 7, 2006, the claimant reported that she was sleeping better and felt calm though still depressed. She was attending a PTSD group. Other than that she was still isolative and staying inside. She had less of a faux brave affect. Dr. Mohr advised the claimant to begin exercising (Exhibit 5F/16-17). Subsequent progress notes from the social worker reveal that the claimant presented regularly through July 2006 and participated in PTSD group. Mental status evaluations were all normal. It was noted that she shared openly in the group and provided and received feedback (Exhibit 5F/10, 13-14). On July 21, 2006, the claimant reported to Dr. Mohr that Lexapro made her feel "woozy," but the Trazodone had alleviated the insomnia. Lexapro was discontinued and Effexor was started (Exhibit 5F/11).

On July 26, 2006 the claimant applied for SSI and on August 4, 2006, she reported to Dr. Mohr that she was having crying spells, low energy and low motivation, as well as problems concentrating She was having no side effects from medication. She was advised to return in one month. In September 2006, the claimant returned to the social worker and was again referred to PTSD group. Mental status was unchanged and was essentially normal. (Exhibit 5F/6,8). On September 13, 2006, the claimant reported to Dr. Mohr that she was out of medication and wanted to continue because she was feeling better than she had in a long time and knew it is due to the medication. She reported that she was also attending the PTSD group. Mental status was essentially normal. Memory was good. She was having no side effects from medication. Plan was "RTC in 2 months at patient's request" (Exhibit 5F/7).

A consultative psychiatric evaluation report dated September 30, 2006 reveals that the claimant reported being depressed since childhood, and stated that she had nightmares, trouble communicating with others, was "afraid," and would forget things a lot. She stated she did not sleep well at night (but see Exhibit 5F/11 wherein the claimant reported to Dr. Mohr that the Trazodone had alleviated the insomnia). She reported that she stopped working because she could not handle the stress but was "rather vague about her work history and why she stopped working." Mental status examination revealed that the claimant was dressed properly and had communicated well with the people in the waiting room. Psychomotor activity was normal. There was no evidence of thought disorder and affect was full and appropriate. Mood was euthymic. There were no hallucinations, no delusions, and there was no suicidal or homicidal ideation. Mental status was essentially normal including intact memory, intellect and comprehension. It was noted that she was able to do her activities of daily living, and was able to use the bus for transportation (she took the bus to the evaluation that day). Diagnosis was adjustment disorder with mixed emotional features Axis I; and dependent personality features

See Next Page

EXHIBIT     21

Chanel L Johnson ▇▇▇▇▇▇▇▇                                      Page 7 of 9

Axis II. The examiner, Dr. Stephan Simonian, opined that claimant was able to perform all psychiatric work-related activities without limitation (Exhibit 1F). I concur with this assessment.

Treatment notes from West Central reveal that the claimant returned on November 7, 2006 and reported to Dr. Mohr that she was feeling much better and was only depressed about half the time. She liked the medication and was having no side effects. She reported being isolative, but mental status was normal. She returned again on January 2, 2007 and reported that she was feeling worse, stating that she went to the "disability doctor" who had stated that she was not depressed. She wanted more medication. Trazodone was discontinued and Effexor and Elavil were prescribed. On January 30, 2007, the claimant reported that the medications were making her drowsy. She reported to Dr. Mohr that she spent her day either sleeping or watching TV, and stated that she liked living like that. Dr. Mohr advised the claimant that she was to get outside and walk 5 days a week and she agreed. Medications were adjusted. On February 27, 2007, the claimant requested that her Effexor be increased again. She stated that she had stopped going to the PTSD therapy because she became confused when trying to express herself (but see social work progress notes which indicate that the claimant participated fully in the group, and had provided and received feedback from others). She reported that she was walking as per agreement. Mental status revealed that her mood and affect were bland but was essentially normal. Medications were again adjusted. No side effects were reported (Exhibit 5F).

At the hearing the medical expert reviewed the record and noted the diagnoses of major depressive disorder and PTSD. He noted evidence of occasional cannabis use with no evidence of abuse or dependence although, as an illegal substance, it would interfere with psychiatric medication. He opined that there was no evidence of a severe mental impairment. The medical expert also noted that adjustment disorder is not as good a diagnosis because it does not indicate what was adjusted to. He states that the claimant is responding to medication and treatment, and does not have a severe impairment. She has possible fatigue from Trazodone which can result in sedation, weight gain, dry mouth, and nausea. Effexor can cause insomnia and anxiety, nausea, sweating, dizziness, loss of appetite, and sometimes elevation in blood pressure. The claimant is taking Trazodone and Effexor now. The record indicates the medication is helping with the symptoms and reducing them. GAF 55 indicates moderate symptoms, not moderate limitations in functioning.

At the hearing, the claimant's uncle, Harry Johnson, testified that he is disabled because of heart problems, and is getting Social Security Disability. He states that the claimant has been living with him for most of her life. He states that he cooks for himself and cleans and also takes care of errands and bills. She gives him money from the GR. He states that she does not do any chores. She watches TV. Medication makes her sleepy. On questioning by the representative, Mr. Johnson testified that the claimant thinks the world is down on her. She is sleepy most of the time. She is not energetic and cannot remember a lot of things. She gets along with him. She does not have contact with other people. He states that she last rode the bus 5 or 6 years ago (but see Exhibit 1F/3 wherein it states that the claimant took the bus to the psychiatric consult). He states that she has no friends. He states that the last time she rode on the bus, she had a fight. He states she cannot remember doctor's appointments (but see mental status examination which consistently show that the claimant's memory is intact—Exhibits 1F, 5F). He states that she has crying spells. He states that she cannot read (but see Exhibit 1E/1 wherein the claimant reported

See Next Page

 EXHIBIT 22

Case 2:08-cv-03878-CT   Document 19   Filed 01/12/09   Page 18 of 19   Page ID #:287
Case 2:08-cv-03878-CT    Document 14-2    Filed 10/02/2008    Page 26 of 105
Chanel L Johnson (                    )                                          Page 8 of 9

that she is able to read, and note also Exhibit 1F/2 wherein it states that the claimant graduated high school and had 2 years of college which would indicate that she is, in fact, able to read).

The medical record indicates that the claimant is responding well to medication and does not currently have more than minimal mental functional limits. A review of her work history shows that she has worked only sporadically prior to the alleged disability onset date which raises a question as to whether her current continuing unemployment is actually due to a mental inability to work or because she has little or no desire to work, given the very sparse medical record. She, in fact, indicated to Dr. Mohr that she does nothing but sleep and watch TV and she "likes living like that" (Exhibit 5F/3). Her allegations of an inability to do normal activities of daily living cannot be explained based on medical factors and must, therefore, be considered voluntary activity restriction.

Although the testimony of the claimant's uncle was generally corroborative of the claimant's allegations, and has been duly considered, their close relationship cannot be entirely ignored in deciding how much weight it deserves. I give little weight to his testimony because he is essentially supporting the claimant and has a direct financial interest in her receiving benefits. In addition, his testimony is not supported by the medical evidence or by the testimony of the medical expert.

In addition, the record contains evidence that the claimant has misrepresented facts relevant to the issue of disability. For example, on the Disability Report (Exhibit 1E/2), she reported having "mood swings, schizophrenic, bipolar, aggressive behavior, phobia, hostility, hallucination," none of which are in evidence. Both she and her uncle testified, under oath, that she cannot read, but as noted, the evidence indicates that she can, in fact, read. She reported to Dr. Mohr that she stopped going to the PTSD group because she became confused when trying to express herself (Exhibit 5F/2) when, in fact, the social worker notes indicate that, prior to stopping, she had been participating fully in the group and had been providing and receiving feedback, and that her mental status evaluations were all normal. I find the claimant's allegations to be inconsistent and unpersuasive, and I do not find to be credible.

The record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled. The conclusion reached by the physician employed by the State Disability Determination Services also supported a finding of "not disabled" based on a non-severe impairment (Exhibit 2F) and I concur with that assessment.

Because the claimant has a medically determinable mental impairment, the undersigned has considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four broad functional areas are known as the "paragraph B" criteria.

The first functional area is activities of daily living. In this area, the claimant has no limitation.

The next functional area is social functioning. In this area, the claimant has mild limitation.

EXHIBIT

23

Chanel L Johnson ▮▮▮▮▮▮▮                                                     Page 9 of 9

The third functional area is concentration, persistence or pace.  In this area, the claimant has no limitation.

The fourth functional area is episodes of decompensation.  In this area, the claimant has experienced no episodes of decompensation.

Because the claimant's medically determinable mental impairment causes no more than "mild" limitation in any of the first three functional areas and "no" limitation in the fourth area, it is nonsevere (20 CFR 416.920a(d)(1)).

**4.   The claimant has not been under a disability, as defined in the Social Security Act, since July 26, 2006 (20 CFR 416.920(c)), the date the application was filed.**

<u>**DECISION**</u>

Based on the application for supplemental security income filed on July 26, 2006, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

Zane A Lang
Administrative Law Judge

JAN 1 1 2008

Date



**24**